Edward J. Dougherty v. Commissioner.
Dougherty v. Commissioner
Docket No. 20041.
United States Tax Court
1951 Tax Ct. Memo LEXIS 277; 10 T.C.M. (CCH) 320; T.C.M. (RIA) 51093; March 30, 1951
*277 Herman J. Posner, Esq., 818 Empire Bldg., 710 N. Plankinton Ave., Milwaukee 3, Wis., for the petitioner. William A. Schwerdtfeger, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency in income tax against the petitioner for the calendar year 1947 in the amount of $12,559, and a 10 per cent ad valorem penalty of $1,255.90. The only issues presents first, a factual question whether petitioner found $31,000 as he claimed, and second, if it be found that he did find the money as claimed, there is the legal question whether the money so found was taxable income. Findings of Fact The petitioner's home is at Greenfield, Wisconsin, a suburb of Milwaukee. He has never filed an income tax return. The Collector of Internal Revenue for Wisconsin, under authority of section 3612 of the Internal Revenue Code, made a 1947 income tax return for the petitioner on May 8, 1948. The petitioner refused to sign the return. The petitioner was born in Milwaukee, Wisconsin, on December 10, 1906. He has a wife and six children. He attended public school up to the eighth grade, but did *278 not graduate. During 1947 and for several years prior thereto, he was a roofing and siding applicator. He operated as an independent subcontractor. At the present time, the petitioner is confined to the State Penitentiary at Waupun, Wisconsin, serving concurrently two setences of from one to thirty-five years each. He was convicted in 1948 of the offenses of carnal knowledge and abuse of one of his daughters, then a minor, and of aiding another in the carnal knowledge of this daughter. He had previously been convicted of several felonies and misdemeanors. On January 1, 1947, the petitioner was living in a second floor, three-room rented flat at 2009 South Thirteenth Steet, Milwaukee. He had been living there for about three years. Living with him, were his wife, his eldest daughter, who was then about fifteen years old, and his youngest son, who was about two years old. The other four children were living in orphanages or state institutions. The four children had been taken from petitioner and his wife and placed in a state institution by court order which also directed that petitioner contribute monthly to their support. He made this contribution for a short time only. By 1947 *279 the children had been in institutions for about four years. At some time in 1947, possibly during the early part of the year, the petitioner brought a used chair of the morris type and a rocker to his home, stating that he had bought the chairs that day from Goodwill Industries. The morris chair was generally in good condition, but as to the rocker, one arm was loose and needed repairing. After eating supper and reading a newspaper for a while, the petitioner decided to repair the rocker and obtained the necessary tools therefor. After the rocker was repaired, he took note that a decorative strip of wood on the front of the morris chair, below the upholstery, was loose. He tilted the chair on its back for the declared purpose of tacking or nailing down the strip of ornamental trim. When the chair was so tilted, it appeared that there was a hole in the black cloth covering the bottom of the chair. A piece of green newsprint protruded from the hole approximately one to two inches. The hole was larger than a silver dollar, but not large enough for the petitioner to put his hand through. The newsprint protruding from the hole was part of a green sheet characteristic of the evening edition *280 of a Milwaukee newspaper. Upon nothing the protruding paper, the petitioner declared to his wife and daughter, who were present, that there must be "gold," "lettuce," or money in the chair. He began pulling at the paper and thereafter extricated from the bottom of the chair six or seven packages of paper money. The first package was wrapped in the green newsprint; the other packages were wrapped in newsprint also, but of the ordinary white variety. In the course of extricating the packages of currency, the petitioner removed one or more tacks or nails fastening the black cloth and the burlap strips of upholstery which were stretched across the bottom of the chair. He also tore the cloth so as to get at the packages more readily. The currency was of various denominations, ranging from five dollar bills to one thousand dollar bills, and the packages were bound with gummed paper tape, such as is normally used in banks. The amount was at least $31,000. After removing the money from the chair, the petitioner broke up the chair and burned the pieces thereof, together with the newspaper wrappings. Within a day or two after the petitioner's arrest in 1948, on the charges for which he was *281 later convicted, a deputy sheriff found in petitioner's home a slip of paper showing a cash purchase by someone of a rocker and one other chair from Goodwill Industries at or about the time the petitioner brought the two chairs to his flat at 2009 South Thirteenth Street. The Goodwill Industries is a charitable organization, and its function is to supply aid to needy individuals. A major activity is the collecting of used and discarded items of wearing apparel, household goods and other things and the reselling of the items so collected after needed repair and renovation. In the renovating and repairing of the items collected, needy and handicapped persons are employed. In collecting, repairing and selling the various items of property contributed to Goodwill Industries, a definite and established method of procedure is followed. On call to the Industries, a truck is sent out to pick up contributed articles. In order to handle heavy or bulky articles, two men usually make the trip. Upon their return, the articles picked up are unloaded at the Industries receiving dock and are inspected for the purpose of determining whether repairs are required or whether they may be sent to the sales *282 room for sale without repair. If the condition of the article is such "that there is absolutely nothing wrong with it," it is sent to the store as it is. If the inspector "does find something wrong, say a rip or a tear or something loose on it, he repairs that immediately." If the cloth on a chair happened to be loose but in good condition, it would be retacked. It would not be the policy of Goodwill Industries to put a chair on sale with a piece of newspaper sticking out of a hole beneath. Any foreign matter protruding from a hole in the chair would be investigated. Ordinarily, when large cushion chairs are brought in, the employees upset and shake them, for in that way they often find a few coins. During 1947, or thereafter, up to the date of the trial herein, no one had called the Goodwill Industries in Milwaukee inquiring of a chair having a large sum of money hidden in it. At some date or dates after taking the money from the chair, the petitioner and his wife signed I.O. U.'s to various of the petitioner's relatives, for the purpose of indicating that the extra money petitioner might be spending was borrowed from the relatives. In April of 1947 the petitioner purchased *283 a home at 1618 North Thirtieth Street, Milwaukee, for which he paid $8,500. He made some repairs and possibly some additions to the property, and sold it in September or October of that year for the price for which it had been bought. He bought an old Cadillac car and sold it at a loss. He next bought a 1941 Buick, which likewise was sold at a loss. He also bought a Chevrolet panel truck for use in his roofing business. In October of 1947, the petitioner purchased a house on Beloit Road, paying therefor $12,800 in cash. He also bought a substantial amount of new furniture for the house, including a piano. He expended further sums for furnishings, clothes and canned food. The petitioner rented three safety deposit boxes, using fictitious names. In order to pass some of the larger bills taken by him from the chair, he paid fairly substantial percentages to the person or persons handling the bills for him. In the absence of books or records kept by the petitioner, the respondent, in determining the deficiency herein, has used the "net worth" method. The net worth of the petitioner at the beginning and end of the taxable year as determined by the respondent is shown as follows: ASSETS
12-31-46
12-31-47
Residence
$12,800.00
Automobile (1947)
2,200.00
Furniture (Household 1947)
3,500.00
Truck (1947)
1,200.00
Mining Stock
200.00
Canned Goods (In Home)
1,000.00
Notes Receivable
4,500.00
Cash
$1,800.00
5,600.00
Total Assets
$1,800.00
$31,000.00
LIABILITIES
NONE
Total Liability
none
none
Net Worth
1,800.00
31,000.00
Net Worth end of year
1,800.00
31,000.00
Net Worth beginning of
year
1,800.00
Increase in net worth
1,800.00
29,200.00
Living Expenses
1,500.00
4,800.00
Income to be accounted for
3,300.00
34,000.00
Income reported as per tax
return
none
none
Income not reported
3,300.00
34,000.00
*284 In 1947, the petitioner, in addition to compensation received for work in his business, acquired $31,000 from sources and in a manner unknown to the Court. Opinion The petitioner does not dispute the correctness of the respondent's determination that he received during the year 1947, from his business and from money taken from the chair, a total of $34,000. His contention here is limited to the proposition that the $31,000 in currency was found by him, and, having been found as claimed, was not income. Before we can reach the question whether money found under the circumstances and in the manner claimed by the petitioner constitutes income, within the meaning of the statute, the petitioner must first establish as a fact that the money in question was so found by him. The petitioner's personal history, and his appearance and demeanor while on the witness stand were not such as to offer any inducement for belief of his testimony, in the absence of outside or independent corroboration. We do believe, however, that he did take the money in question from a chair which he brought to his flat in Milwaukee sometime during the early part of 1947. The first disclosure concerning the *285 money came, not from the petitioner, but from his wife and daughter at the time of the petitioner's arrest in April of 1948, on the charges for which he was later convicted and is now serving heavy terms in the state penitentiary. At the time of his arrest, his wife was estranged and was not living with him. She had been living at her mother's home for approximately five to six months. The petitioner obviously had received or obtained money in a substantial amount or amounts from sources other than his business of roofing and siding applicator. The knowledge of the wife and daughter as to the amount, other than that to them it was substantial, was limited to petitioner's statements with respect thereto. The petitioner's story as to the amount ranged from $9,000 to $10,000, on the first telling, and as to denominations of the bills, from five to fifty dollars, up to the $31,000 now admitted and to bills of denominations up to one thousand dollars. In numerous other details, the stories told by the petitioner at various times at the sheriff's office in Milwaukee and that told by him on the witness stand at the trial herein, are at variance. The petitioner's wife, in her testimony, *286 did corroborate petitioner's story of the actual taking of the money from the chair. As to the acquisition of the chair, her testimoney was obviously based on what the petitioner had told her. It is to be noted also that the petitioner's wife was not an impressive witness, and further, she admitted that she had lied in various of her statements about the money when questioned at the sheriff's office in April of 1948. In addition to the absence of evidence corroborating the petitioner's claim that the money in question first came into his possession through a finding of it in a chair which he had purchased from Goodwill Industries, there is independent evidence which, in our opinion, rather pointedly refutes the petitioner's claim. The Goodwill Industries is an organization well known and established in the charitable filed. An important part of its operations is the giving of work to needy and handicapped persons in repairing and renovating articles donated to Goodwill. That method of operation enables such persons to feel that they are not receiving a "hand out," but are earning what they get. It is not at all likely, therefore, that a rocker which admittedly needed repair at the *287 time the petitioner brought it to the flat would have gone to the sales room at Goodwill Industries, rather than to the repair room. Furthermore, the practice of handling various articles, particularly chairs of the type from which the money was taken, rather definitely demonstrates that a hole in the burlap and the cloth covering the bottom of the chair, from which a piece of green newsprint was protruding some one to two inches, would not have escaped the attention and examination of the employees at Goodwill Industries, even though it be assumed that the inspector might not have regarded the hole as detrimental to the sale of the chair, without repair. Also the stories of the petitioner and his wife as to things which transpired at the time the money was taken from the chair indicate that the petitioner's actions and remarks were, to say the least, a bit "pat." He first decided that he would repair the armed rocker, and after completing that job, he tipped the overstuffed chair on its back, for the declared purpose of tacking down a piece of trim on its front, below the upholstery. His story, at the sheriff's office, was that a bolt was missing. At the time of the trial herein, *288 his story was that there was no bolt missing, but that the strip needed nailing down. It was then, according to his testimony, that he discovered the hole in the cloth on the bottom of the chair, from which the piece of green newsprint was protruding one to two inches. According to his testimony, he immediately came to the conclusion that there was "gold," "lettuce," or money in the upholstery of the chair and upon removing the tack or tearing the upholstery, or both, he immediately found that what he had expected was true, namely, that there was currency amounting to $31,000, in the six or seven separate packages in the upholstery of the chair. Frankly, we do not believe the story. Considering all of the evidence, the testimony of the witnesses and the picture as shown by them, it is our conclusion that if, as may well have been the case, the chairs in question were the chairs which had been purchased from Goodwill Industries on the sales slip later found in the petitioner's home, the chairs at the time they were brought by him to the flat were not in the condition they were when he left Goodwill Industries. We do not believe that the armed rocker was in such a condition as to need *289 repair, as petitioner described, when he acquired it; and if the upholstered chair was the chair purchased at Goodwill Industries, we do not believe that there was any such hole in the bottom of the chair with the paper protruding from it, such as the petitioner described, at the time it was purchased. In short, we do not believe the money was in the chair when the chair was acquired by the petitioner. Where the petitioner got the money which he later took from the chair and in what manner it was obtained by him, we do not know. It is accordingly impossible for us to conclude and hold that the $31,000 here in question was not acquired by him in a manner such as would make it income to him within the meaning of the statute. Such being the case, we do not reach the question whether money, if acquired in the manner claimed by the petitioner, is income under the statute. Decision will be entered for the respondent.